Filed 5/7/13  P. v. Gonzales CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054350 |
| v. | (Super.Ct.No. RIF10004191) |
| ROBERT JOHN GONZALES, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Gary B. Tranbarger, Judge.  Affirmed with directions.

David McNeil Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and William M. Wood and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I.  INTRODUCTION

Defendant Robert John Gonzales appeals from his conviction of first degree murder (Pen. Code,[1] § 187, subd. (a)) with true findings on allegations of use of a deadly weapon, a knife (§ 12022, subd. (b)(1)); a prior strike conviction (§§ 1170.12, subd. (c)(1), 667, subds. (c), (e)(1); a prior serious felony conviction (§ 667, subd. (a)); and a prior prison term felony conviction (§ 667.5, subd. (a).)

Defendant contends (1) the trial court erred in excluding evidence that the victim had methamphetamine in his system at the time of his death; (2) his trial counsel provided ineffective assistance by failing to request an instruction that if the jury found defendant had been threatened by gang members in the past, they could consider that information in determining whether he was justified in acting in self-defense; and (3) the trial court erred in imposing a three-year enhancement under section 667.5, subdivision (a);  The People properly concede the three-year enhancement must be stricken.  We find no other prejudicial error.

# II.  FACTS AND PROCEDURAL BACKGROUND

## A.  Prosecution Evidence

Around 11:00 p.m. on September 11, 2010, Stephanie Sanders drove Jesse Ochoa and Jessica Murillo to a liquor store on University Avenue in Riverside.  Ochoa and Sanders entered the store while Murillo waited in the car.  Defendant approached and said to Ochoa, "I know you from somewhere.  I don't like you.  Go outside."  Defendant

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

2

then went to the counter and paid for his purchase. Ochoa and defendant went outside, and Ochoa ran to the back of Sanders's car and threw his glasses in. Ochoa walked to the side of the store with defendant behind him. Sanders told Murillo the men were going to fight.

Sanders got into the car and started to put it in reverse when she saw the two men fighting in the parking lot and street next to the building. Murillo saw defendant throw one punch at Ochoa's eye. Sanders drove toward where the men were fighting, throwing punches at each other. Murillo opened the window, and the women yelled for Ochoa to get into the car, but he was "kind of wobbly already" and did not appear to understand. Sanders heard Ochoa say to defendant, "Why you got to pull that out for?" Murillo saw Ochoa walking backward, saying, "[P]ut it down. Put it down." Neither Sanders nor Murillo saw Ochoa with a weapon at any time that night, and they did not see him with a screwdriver.

Murillo saw that defendant had a knife with a four- or five-inch blade in his hand. Ochoa was bloody, and he could not walk. Murillo pulled him into the car. Defendant got into a truck that pulled up.

Ochoa was bleeding heavily, and he was not breathing. Murillo and Sanders drove him to the hospital, where he died from multiple stab wounds. The autopsy disclosed that he had sustained nine separate stab wounds, including one to the heart. Four or five of the wounds were consistent with defensive injuries, and two of the wounds were to the back. A screwdriver was found in Ochoa's clothing at the hospital, but it did not appear to have any blood on it.

3

Footage from the liquor store's surveillance cameras was played for the jury. In one image, a knife with a clip could be seen in defendant's shorts pocket while he was in the store. Images from cameras outside the store showed defendant leave the store and throw his shirt into the bed of a truck. Defendant's friend got into the driver's seat of the truck and backed out of the parking lot. Ochoa threw something into Sanders's car and walked back toward the front doors of the store. The video recording then showed Ochoa, followed by defendant, walking toward the back of the store. The video did not show Ochoa with any weapon, but he made a movement like he was grabbing or untucking the front of his shirt. Ochoa and defendant went out of view of the cameras, and the truck drove in the same direction.

At the scene, the police saw a 60- or 70-foot trail of blood droplets. The truck that had been seen in the video recording was located on September 13 in the parking lot of an apartment complex. Blood on the passenger side of the truck and on defendant's shoes was consistent with that of Ochoa.

Defendant was arrested on September 14, 2010. After being interviewed, he insisted he had to use the restroom. The detectives handcuffed him and led him toward the restroom on the other side of the lobby. Defendant began to pull them toward the front doors and struggled for 30 seconds to three minutes with four or five officers until they brought him under control.

After the struggle, Detective Mike Medici had a brief conversation with defendant. At first defendant denied the killing, and the detective said it made no sense to deny it because the evidence would show he did it, and it would make more sense if there was a

4

reason for the killing. Defendant said, "It's cause he molested my daughter," but he did not elaborate. He did not mention self-defense and did not mention that the victim had a weapon, a screwdriver, or an ice pick. Defendant did not have any wounds on his body, including his hands, arms, and upper body.

Defendant was taken to the hospital to get a release before booking. He told the officer who was transporting him that he was upset his friend had "ratted him out," and his friend who had driven him away from the scene should be there too because he was an accessory. While waiting at the hospital, defendant had a conversation with another officer. Defendant stated he did not mean to kill a guy, and he asked if the guy had come to the same hospital.

## B. Defense Evidence

Defendant testified in his own behalf. He used to be part of the Patterson Park clique of the East Side Riva (ESR) gang. He spent time in prison for a 2004 conviction of assault with a gang enhancement. After his release in 2008, he no longer ran with the gang, but he was never actually "jumped out." He was married and had a daughter, and he helped take care of his grandmother. He told ESR members he was tired of gang life.

While he was in prison, he got a tattoo of "Riva" on the back of his head, and when he was younger, he had gotten a tattoo of "Riva" on his stomach and tattoos of the letters "E" and "S" on his arms and the letter "P" (for Patterson Park) on the back of each arm.

He believed younger ESR members may have seen his leaving the gang as an opportunity to prove themselves to the gang by attacking him. He had been "jumped" by

5

ESR members two or three times since he stopped claiming the gang. He did not report the incidents because he did not trust the police.

On September 11, he had gone to the liquor store for beer when Ochoa, whom defendant did not know, said, "I know you," to him. Ochoa said he was called "Liars," which defendant understood was a gang name. (It was stipulated that Ochoa was a member of ESR.) Defendant stated that in gang culture, members gave their gang names to let others know who they are and to flaunt their status. In response to Ochoa, defendant said, "So?" although he knew gang members would consider this disrespectful. When he was outside, he saw Ochoa walking near the front doors of the store. Ochoa said, "Let's go to the alley," which defendant knew meant they were going to fight. Defendant took off his shirt. He wanted to show he would stand his ground, or things would be worse for him in the neighborhood.

Ochoa walked five or six feet ahead of him toward the alley. Defendant saw Ochoa turn and look at him while fumbling with his waist. He thought Ochoa might be grabbing a gun or other weapon; gang members usually kept guns in their waistbands or right front pockets. He became nervous, pulled out his knife, and held it by his side. When defendant was about three feet away, Ochoa turned and swung at him with his right hand. Because of a glare from a streetlight, defendant thought Ochoa was holding an ice pick. Defendant backed up and jabbed his knife forward. He stepped back and told Ochoa to back up, but Ochoa again approached and swung with what appeared to be an ice pick. Defendant stabbed him again in the left side. He believed he had stabbed him a total of four times; it all happened within a few seconds. Ochoa kept approaching

6

him, and defendant kept backing up. Finally, the truck and car pulled up. Ochoa walked to the car, and defendant got into the truck. Before defendant got into the truck, Ochoa said he was a "Tiny Duke," another clique within ESR.

Defendant did not intend to kill Ochoa, and he did not know how badly he had hurt him. He was surprised to learn Ochoa had died. When he was interviewed by the police, he lied because he did not think the police would believe him if he said it had been self-defense. He became angry and struggled with the officers because they told him he would never see his daughter again and that she had a "low life" for a father.

Defendant denied that he had claimed being a member of East Side Riva when he was booked in to jail, and if the deputy said otherwise, he was lying. He denied that he had told Detective Medici the reason he had done it was because Ochoa had molested his daughter. He stated that what he had actually said was, "Look, let me give you an example. If I told you he molested my daughter, if I told you we [had] bad blood, if I told you we fought, or if I told you we had anything between us that would look premeditated, hateful, it would look worse when I go to trial."

During the fight, defendant was never struck, and he did not get any cuts or scrapes. After the fight, he panicked and threw the knife in the trash at his apartment complex. After the fight, he went to Lake Alice and drank some beer.

Defendant admitted he lied when Detective Brandt asked him about the knife shown on the video recording and had said it was a keychain. He lied when he told the detective he had walked to the side of the store to urinate. He did not tell the detectives the truth when they asked if someone had attacked him and he had to defend himself

7

because he felt they would not believe him. Defendant did not remember telling the officers that he had not seen a weapon in Ochoa's hand.

A toxicologist testified that Ochoa had a blood alcohol level of 0.04 percent, measured at 1:30 a.m. on September 12. His level at about 11:30 p.m. on September 11 would likely have been between 0.07 and 0.08 percent, and would have been even higher at 10:30 p.m.

## C. Rebuttal

Detective Brandt testified that he had interviewed defendant on September 14. Defendant said 12 to 15 times during the interview that he was being truthful. The detective told defendant he had seen defendant in the surveillance footage, but defendant did not admit he had been in a fight or that he had had a knife. He said the item visible in his pocket in the surveillance video was a pen, a lighter, or a carabiner on his key ring. Defendant denied having blood on his shoes. He said he walked to the side of the building to urinate, and he heard two people arguing, so he turned around and walked back to his car. One of the people involved in the fight had gotten into a white car. He had seen police cars at the scene when he drove by later, but he kept going because he did not think it had anything to do with him.

Detective Brandt told defendant he knew defendant had killed Ochoa, and that it had to have happened for a reason. The detective suggested that defendant had defended himself against Ochoa trying to rob him. Defendant never said he was afraid for his life, and he denied being involved in a fight. He denied being threatened by anyone,

including any gang members, at the store. He never mentioned that he saw someone backing up and yelling gang things getting into a white car.

When defendant was booked into jail and was asked by the classification coordinator if he was a member of a gang, he replied that he was a member of ESR.

**D. Verdict and Sentence**

The jury found defendant guilty of first degree murder (§ 187, subd. (a)) and found true a weapon use allegation (§ 12022, subd. (b)(1)). Defendant admitted a prior conviction as a prior prison term, a prior serious felony, and a strike. (§§ 667.5, subd.(a), 667, subds. (a), (c), (e)(1), and 1170.12, subd. (c)(1).)

The trial court sentenced defendant to 50 years to life for the murder and to consecutive terms of one year for the weapon use enhancement, five years for the prior serious felony, and three years for the prior term prior.

Additional facts are set forth in the discussion of the issues to which they pertain.

### III. DISCUSSION

**A. Exclusion of Evidence of Methamphetamine in the Victim's System**

Defendant contends the trial court erred in excluding evidence that the victim had methamphetamine in his system at the time of his death.

*1. Additional Background*

During pretrial motions, defense counsel indicated he wished to introduce into evidence that Ochoa's blood tested positive for alcohol and methamphetamine. The prosecutor argued the evidence of alcohol was marginally relevant because Sanders and Murillo testified they all had not been drinking before the incident but that evidence of

9

methamphetamine was irrelevant. The trial court sustained the prosecutor's relevance objection unless defense counsel would have a qualified witness testify that the level of methamphetamine in Ochoa's system was predictive of aggressive behavior.

Outside the presence of the jury, Erin Crabtrey, a toxicologist, testified that she and another toxicologist had analyzed Ochoa's blood that had been tested at 1:30 the morning after his killing. The level of methamphetamine detected was 97 nanograms per milliliter.

Crabtrey testified she was familiar with the physical effects and symptoms methamphetamine produces: "Emotional, you could expect to see, depending on what stage of their intoxication that they're at, but they could have rapid flight of ideas, quick speech or sped-up speech, increased perception of time; depending on what stage, they could have some amounts—some amounts of aggression or euphoria. There's a wide array of symptoms that you could see, but it depends on how much the person has taken and what stage of their intoxication that they're at."

She testified there was no clear-cut level at which a person would show symptoms of being under the influence of methamphetamine. She explained, "But for drugs, a person's past history, whether or not they are a chronic user to somebody who has taken it for the first time. The differences between people can vary." There was no way to tell from the blood analysis alone whether someone was a chronic or a first-time user or whether Ochoa was under the influence. Methamphetamine use could even have made Ochoa less aggressive, but Crabtrey could not make any intelligent inference based simply on the numbers.

*2. Analysis*

The constitution guarantees a criminal defendant a meaningful opportunity to present a complete defense. (*Crane v. Kentucky* (1986) 476 U.S. 683, 690.) Thus, a criminal defendant has a due process right to present all relevant evidence of significant probative value in his defense. (*Washington v. Texas* (1967) 388 U.S. 14, 19.) However, as a general rule, application of the ordinary rules of evidence does not impermissibly infringe on a defendant's right to present a defense. (*People v. Cunningham* (2001) 25 Cal.4th 926, 998-999.)

Under California law, unless otherwise provided by statute, all relevant evidence is admissible. (Evid. Code, § 351; *People v. Basuta* (2001) 94 Cal.App.4th 370, 386.) Relevant evidence is evidence having any reasonable tendency to prove or disprove a disputed issue. (Evid. Code, § 210.) However, the trial court has discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission will require undue consumption of time or create substantial danger of prejudice or of confusing or misleading the jury. (Evid. Code, § 352.) For purposes of Evidence Code section 352, "probative value" is used interchangeably with the term "relevance" under Evidence Code section 210. (*People v. Hill* (1992) 3 Cal.App.4th 16, 29, disapproved on another ground in *People v. Nesler* (1997) 16 Cal.4th 561, 582.) We apply the deferential abuse of discretion standard of review to evaluate a trial court's decision to exclude evidence under Evidence Code section 352. (*People v. Basuta*, *supra*, at p. 386.)

To support his argument, defendant relies primarily on *People v. Wright* (1985) 39 Cal.3d 576 (*Wright*), in which the court found error in the exclusion of evidence that the murder victim had heroin in his system within 24 hours of his death. The court stated, "[T]he probative value of the evidence here was significant, while its prejudicial effect was minimal at best. Defendant's sole theory to support an acquittal was that he acted in self-defense in response to the victim's irrational behavior. No evidence was presented to corroborate defendant's version of the incident. Defendant therefore attempted to support his perception of the victim's irrational state of mind by introducing evidence from which the jury could infer the victim was under the influence of a narcotic. Contrary to respondent's assertions, the fact that the evidence was not conclusive on this point did not negate its probative value to defendant's self-defense claim." (*Id.* at pp. 583-584.) Based on *Wright*, defendant argues that the excluded evidence "went directly to his defense that Ochoa acted aggressively toward him by confronting him and challenging him to a fight, and then turning and attacking him when they were walking together toward the alley."

Notably, in *Wright*, while the court found error in the exclusion of evidence of heroin in the victim's urine, the court concluded the error was not prejudicial. The court explained, "Although the excluded evidence would have allowed the jury to infer the victim was under the influence of heroin, this inference would have done little towards corroborating defendant's testimony that the victim was, as a result, irrational and aggressive." (*Wright*, *supra*, 39 Cal.3d at p. 585.)

Here, defendant's self-defense claim was that because Ochoa fumbled with his shirt at his waist, defendant reasonably believed Ochoa was reaching for a weapon, and at

12

that point defendant pulled his knife. Defendant testified that if Ochoa had not gone for his waistband, defendant would not have pulled out his knife, and they would have just gotten into a fistfight. He further stated he was prepared to use his knife before he even knew what Ochoa had. In short, defendant identified the specific actions on the part of Ochoa that led to his belief Ochoa was armed. Those actions, i.e., Ochoa's fumbling with his waistband, were shown on the surveillance DVR. Thus, there was no dispute that Ochoa had fumbled at his waistband as the two men walked toward the alley, and notably, that gesture occurred before the fight began. As relevant to a self-defense theory, the disputed issues were whether defendant reasonably interpreted Ochoa's gesture as reaching for a weapon and whether defendant acted reasonably in response. Evidence that Ochoa had methamphetamine in his system would have contributed nothing to the jury's determination of those issues, and the evidence thus had little probative value.

We conclude that even if the trial court erred in excluding the evidence, the error was not prejudicial.

## B. Assistance of Counsel

Defendant contends his trial counsel provided ineffective assistance by failing to request an instruction that if the jury found defendant had been threatened by gang members in the past, it could consider that information in determining whether he was justified in acting in self-defense.

A defendant who claims to have received ineffective assistance of counsel must show both that his counsel's representation fell below an objective standard of

13

professional conduct and that, in the absence of counsel's deficient performance, there is a reasonable probability the result would have been more favorable to the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.)  In determining whether there is a reasonable probability the jury would have reached a different result if a requested instruction had been given, "[t]he question is not what a jury *could* have done, but what a jury would *likely* have done if properly instructed."  (*People v. Reeves* (2001) 91 Cal.App.4th 14, 53.)  "In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result."  (*People v. Breverman* (1998) 19 Cal.4th 142, 177.)

The trial court has a duty to instruct the jury sua sponte on general principles of law that are supported by the evidence.  (*People v. Breverman*, *supra*, 19 Cal.4th at p. 154.)  However, an instruction that relates particular facts to the elements of the offense is a pinpoint instruction that need not be given sua sponte, but must be requested. (*People v. Silva* (2001) 25 Cal.4th 345, 371.)  When a defendant claims self-defense, the jury may consider the effect of prior assaults and threats by the victim or persons associated with the victim against the defendant on the reasonableness of the defendant's conduct (*People v. Minifie* (1996) 13 Cal.4th 1055, 1065 (*Minifie*)) but the trial court is not required to instruct the jury on antecedent threats or assaults unless requested to do so.  (*People v. Garvin* (2003) 110 Cal.App.4th 484, 489.)

In *Minifie*, the issue was whether error in excluding evidence of prior threats was prejudicial. The Supreme Court held that under the circumstances of the case, including the prosecutor's argument to the jury that there was no evidence to support the self-defense theory, it was reasonably probable the error affected the verdict. (*Minifie*, *supra*, 13 Cal.4th at p. 1072.) Here, in contrast, the evidence of prior threats and assaults was admitted. The jury was properly instructed on the elements of the charged crime and of lesser included offenses as well as on theories of perfect and imperfect self-defense. Under those instructions, the jury was directed to consider whether defendant actually believed imminent danger existed and whether that belief was reasonable. The jury was instructed that in deciding the reasonableness of defendant's belief, it was to "consider *all the circumstances* that were known to and appeared to the defendant." (Italics added.) We presume the jury followed the trial court's instruction to consider all those circumstances, including the prior threats and assaults on defendant. (*People v. Bennett* (2009) 45 Cal.4th 577, 595.) We conclude it was not reasonably probable defendant would have received a more favorable verdict if his counsel had requested the pinpoint instruction. Defendant's claim of ineffective assistance therefore fails.

## C. Enhancement Under Section 667.5, Subdivision (a)

Defendant contends the trial court erred in imposing a three-year enhancement under section 667.5, subdivision (a); The People properly concede that the three-year enhancement must be stricken because it was based on the same conviction as his five-year serious felony enhancement under section 667, subdivision (a). (See *People v. Jones* (1993) 5 Cal.4th 1142, 1150.)

15

**D. Correction of Abstract of Judgment**

On our own motion, we observe that the abstract of judgment does not reflect that defendant was sentenced as a second striker under section 1170.12. We will order the abstract of judgment to be amended accordingly.

## IV. DISPOSITION

The trial court is directed to strike the three-year enhancement under section 667.5, subdivision (a), to prepare an amended abstract of judgment reflecting that change as well as indicating on line 8 that defendant was sentenced under section 1170.12, and to forward the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
J.

We concur:

RAMIREZ
P.J.

RICHLI
J.

16