Filed 12/14/21  P. v. Weith CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>JAN A. WEITH,<br><br>　　　Defendant and Appellant. | A155950<br><br>(San Francisco County<br>Super. Ct. No. SCN229297) |

Frustrated in his efforts to enter his parking garage without his monthly parking pass, defendant Jan A. Weith drove his car at the parking attendant, pinning him against the parking booth wall. The jury convicted Weith of assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1)), battery with serious bodily injury (§ 243, subd. (d)) and leaving the scene of the accident (Veh. Code, § 20001, subd. (a)), but acquitted him of attempted murder. On appeal, Weith argues the trial court erroneously instructed the jury on assault with a deadly weapon by including—as applied to a car—in the deadly weapon definition, the phrase "that is inherently deadly." We agree that including the phrase was error but, on this record, find it harmless. We also reject Weith's argument that the jury should have been

---

[1] All further undesignated statutory references are to the Penal Code.

1

instructed that assault required a specific intent and an unlawful attempt. Similarly frivolous is Weith's claim that the assault law is unconstitutionally vague.

Weith first requested pretrial mental health diversion (§ 1001.36) at sentencing and the trial court denied it. Weith asks us to remand for resentencing. Relying on Second and Fourth appellate district cases, the Attorney General argues that the diversion request—after the guilty verdict—was untimely. We agree and affirm the judgment.

## PROCEDURAL BACKGROUND

Weith was charged with attempted murder (§§ 664, 187, subd. (a)—count 1), assault with a deadly weapon (§ 245, subd. (a)(1)—count 2), felony battery causing serious bodily injury (§ 243, subd. (d)—count 3), and leaving the scene of an accident (Veh. Code, § 20001, subd. (a)—count 4). With respect to counts 1 through 3, the information further alleged great bodily injury and deadly weapon enhancements (§§ 12022.7, subd. (a), 12022, subd. (b)(1)).

The jury convicted Weith of the assault with a deadly weapon and battery charges and of leaving the scene of an accident, but acquitted him of attempted murder. The jury also found true the great bodily injury and deadly weapon enhancement allegations.

In his sentencing memorandum and at the sentencing hearing, Weith sought probation or referral to the behavioral health court. In the alternative Weith asked the court to "allow the defense to vacate Mr. Weith's conviction and petition for Mental Health Diversion." Weith argued that under section 1001.35 "anyone with a diagnosed mental disorder. . . can obtain pre-plea diversion" and "[e]ven though the statute does state that diversion is not available after trial, the [Court of Appeal in *People v. Frahs* (2018)

2

27 Cal.App.5th 784, review granted Dec. 27, 2018, S252220; see *People v. Frahs* (2020) 9 Cal.5th 618, 626 (*Frahs*)] finds that retroactivity principles require that a defendant who was convicted before diversion took effect but whose case is not yet final on appeal is entitled to ask that his conviction be vacated and that he be considered for diversion." The trial court found Weith to be "a danger to the community" because "he came within a hair of killing someone." "[H]e has been on probation a number of times, in [the] last 20/25 years and has never, apparently, addressed these mental health issues in a way that prevented or would have prevented this incident." Absent unusual circumstances, which the court did not find, Weith was ineligible for probation (§ 1203, subds. (e)(2), (e)(3)). The court did not conduct a mental health diversion hearing and sentenced Weith to five years in state prison.

## FACTUAL BACKGROUND

On May 5, 2018, Weith purchased a new "Chevrolet Camaro, Super Sport Hot Wheels" edition at a dealership in San Jose. Unlike his previous cars, the Camaro had paddle gear shifters on the steering wheel, in addition to a traditional gear shift. The Camaro, with its 485 horsepower engine, was twice as fast as any vehicle he had driven. Weith testified that he drove from San Jose to the San Francisco Hilton parking garage, where he had a monthly parking pass. As he entered the garage, Weith realized he left his entry card in San Jose. Rather than taking a parking ticket, he skirted the entry gate and drove over the center pylons between the entrance and exit lanes. Once in the garage he changed his mind, made a U-turn, and drove back over the pylons. Having exited, he decided to reenter and, in doing so positioned his car across the entry and exit lanes. He accelerated and the Camaro reversed "rather quickly," hitting the garage wall. Weith put the car in drive, using the center console, and prepared to drive forward, but when he

took his foot off the brake, the car did not move. So he stepped on the accelerator; the car lurched forward, "smash[ing] into" the arm gate and knocking it to the ground. Weith put the car in park, got out, saw "significant damage" to the front of the car, and "felt terrible" because he had "wrecked" his new car less than two hours after purchasing it.

The parking garage manager, Victor Delos Santos, who was next to his office booth and about 10 to 15 feet from the car, asked Weith if he needed anything. Weith did not respond to Delos Santos. Delos Santos testified that he made eye contact with Weith for about five seconds, before Weith got back into his car.

According to Weith, when he took his foot off the brake, the car did not move. Weith then stepped on the accelerator and "may have used the paddle shifter" on the steering wheel. As the car lurched forward, Weith "gripped the steering wheel" and "braced for impact." Delos Santos tried to move out of the way, but it "was too late." In a "split second," the car crashed into Delos Santos, impaling him against the office booth causing a "very violent," "loud" collision that sounded "like an explosion." Weith testified that he had not seen Delos Santos, and he "absolutely" did not intend to back into the wall, drive into the arm gate, or crash into the booth and Delos Santos.

It sounded to one eyewitness like Weith had "floored" the engine. Video surveillance footage and eyewitness testimony established that Weith drove straight into Delos Santos and the office booth. The glass windows of the booth "exploded" and the concrete buckled.

Delos Santos, who was pinned between the rubble of the booth and the car, screamed in pain. His broken left shin bone protruded through his skin.[2]

---

[2] The defense stipulated that Delos Santos suffered great bodily injury.

Joseph Walters, who was across the street from the parking garage, heard a "loud crash" and saw that a car had "slammed" into the garage. The car "skirted along the wall" of the garage before it crashed into the arm gate and into the parking booth. As he approached the Camaro, Walters heard Delos Santos screaming in pain, yelling, "he tried to kill me," and saw Weith in the driver's seat. With the engine running, Weith exited the car, walked past Walters and left the garage.

Weith testified that he did not hear anyone crying for help and did not call the police. "[D]isoriented and on "auto mode," Weith walked back to his apartment, where he drank some vodka. He then went to a nearby bar and drank some whiskey. Weith went to a second bar, but could not remember if he had a drink there. As Weith was returning to the garage about 15 minutes after the collision, he was apprehended by the police.

Weith appeared calm, and unaffected when told by an officer that his car injured someone. Weith told police the Camaro had no mechanical issues, he was not on any medications and had no physical or mental impairments. After administering various tests, police concluded Weith was not under the influence of alcohol.

## DISCUSSION

Weith contends his convictions for assault with a deadly weapon and battery should be reversed due to various instructional errors and on constitutional grounds. Alternatively, he argues the matter should be remanded for a mental health diversion hearing. We disagree and affirm.

### I. Jury Instructions

Weith claims the trial court prejudicially erred by incorrectly instructing the jury on assault in several respects.

## A.   *Instructions Given*

For the assault with a deadly weapon charge, the court used CALCRIM No. 875, which instructed that the People had to prove the following: "1. The defendant did an act with a deadly weapon other than a firearm that by its nature would directly and probably result in the application of force to a person; [¶] 2. The defendant did the act willfully; [¶] 3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its very nature would directly and probably result in the application of force to someone; [¶] AND [¶] 4. When the defendant acted, he had the present ability to apply force with a deadly weapon other than a firearm."

As given, CALCRIM No. 875 defined a "deadly weapon other than a firearm" as "any object, instrument, or weapon *that is inherently deadly* or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury." (CALCRIM No. 875; italics added.) Regarding the weapon enhancement, the court instructed that "a deadly or dangerous weapon is any object, instrument, or weapon that is inherently . . . dangerous or one that is used in such a way that it is capable of causing or likely to cause death or great bodily injury. [¶] In deciding whether an object is a deadly weapon, consider all the surrounding circumstances, including when and where the object was possessed . . . and any other evidence that indicates whether the object would be used for a dangerous, rather than a harmless, purpose." (CALCRIM No. 3145.) The court did not include the CALCRIM Nos. 875 or 3145 definition of "inherently deadly."[3]

---

[3] "An object is *inherently deadly* if it is deadly or dangerous in the ordinary use for which it was designed." (CALCRIM Nos. 875 & 3145.)

6

For the lesser included offense of simple assault, the court instructed, using CALCRIM No. 915, that the People had to prove the following: "1. The defendant did an act that by its nature would directly and probably result in the application of force to a person; [¶] 2. The defendant did that act willfully; [¶] 3. When the defendant did the act, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; [¶] AND [¶] 4. When the defendant acted, he had the present ability to apply force to a person." (CALCRIM No. 915).

## B.    *Inclusion of "Inherently Deadly" Language*

Weith contends the trial court prejudicially erred by instructing the jury that it could find him guilty of using a deadly weapon under the theory that a car is "inherently deadly."

In considering the assault with a deadly weapon charge in count 2 and the deadly weapon enhancement in counts 1 and 3, the jury had to determine whether Weith's car was a deadly weapon. Employing CALCRIM No. 875, the court instructed that: "A *deadly weapon other than a firearm* is any object, instrument, or weapon that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury." For the weapon enhancement, the court read CALCRIM No. 3145 and again included the phrase "that is inherently deadly." The court did not include the CALCRIM definition of "inherently dangerous" in either CALCRIM Nos. 875 or 915. Weith did not object to these instructions.

Where the instrumentality is a car, it is error to include the phrase "that is inherently deadly" in the definition of "a deadly weapon other than a firearm." (*People v. Stutelberg* (2018) 29 Cal.App.5th 314, 317–318; Bench Notes to CALCRIM No. 875.) A car *may* be used in a manner that makes it a

7

deadly weapon, but it is not an *inherently* deadly weapon as a matter of law. (*People v. Montes* (1994) 74 Cal.App.4th 1050, 1054 [noting that a car is not inherently dangerous but can be found to be a deadly weapon].) For the jury to properly find that Weith used a deadly weapon under the facts of this case, it had to find that Weith "used [the car] in such a way that it is capable of causing and likely to cause death or great bodily injury." (CALCRIM No. 875.)

When both a correct and an incorrect instruction have been given, to decide whether the error requires reversal, we apply *People v. Aledamat* (2019) 8 Cal.5th 1, 7–8 (*Aledamat*). There, the defendant was on trial for assault with a deadly weapon (§ 245), and jurors were given both correct and incorrect alternative instructions; they were told that a weapon "could be *either* inherently deadly *or* deadly in the way defendant used it." (*Aledamat*, at p. 6.) Because the weapon—a box cutter—was "not an inherently deadly weapon as a matter of law" (*ibid.*), the first part of the instruction was erroneous, but the second part was correct. (*Id.* at p. 7.) *Aledamat* held: "The reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Id.* at p. 13.) In so holding it rejected a more demanding standard of review, advocated by the defendant, that would have required the court to examine the verdict and the record and to find evidence in the record to support a determination, beyond a reasonable doubt, that the jury actually relied on the valid, not the invalid, theory. (*Id.* at p. 9.) The Supreme Court held such a course is not required. It is enough if we can say, beyond a reasonable doubt, the legally inadequate theory did not contribute to the verdict. (*Id.* at pp. 12–13.)

In *People v. Thompkins* (2020) 50 Cal.App.5th 365, 399, we recently applied the *Aledamat* standard of review, explaining "the question is not whether we think it clear beyond a reasonable doubt that the defendants were actually guilty . . . based on the valid theory, but whether we can say, beyond a reasonable doubt, the jury's actual verdicts were not tainted by the inaccurate jury instruction. We focus on the likelihood that the jury relied on the [incorrect] instruction in reaching its verdicts, not simply the likelihood of defendants' guilt under a legally correct theory."

Under that standard of review, the error was harmless in this case. Having reviewed the evidence, we are confident the inclusion of the phrase "inherently deadly" did not contribute to Weith's conviction of assault with a deadly weapon other than a firearm. Most compelling is the surveillance video that graphically depicts the entire incident. At 17:47:35 of the video, the orange Camaro speeds into the parking lot, avoiding the entry gate by running roughshod over the four upright pylons intended to prevent entry. One minute later, driving at the same rate, the Camaro again drives over the pylons and exits between the entry and exit gates. Thirty seconds later, presumably in response to the Camaro's extraordinary roundtrip, Delos Santos appears from the attendant's booth, walks in front of the booth, looking in the direction of the recently departed car and then walks to the middle of the entry lane. Four seconds later, the Camaro speeds into the garage, but this time, instead of traveling down the middle as it did moments before, the car veers to the right aiming directly at Delos Santos. The Camaro crashes into Delos Santos pushing him through the wall and window of the attendant's booth which crumbles under the impact. As soon as the car comes to rest—with Delos Santos crushed between it and the remains of the booth—

9

Weith exits, turns toward Delos Santos and then reenters the car. He reaches forward and then exits, closes the car door and departs the garage.

Delos Santos described what the video did not depict. After exiting the garage, the Camaro was parked "parallel to the street" "literally blocking both [the entrance and exit] lanes." As Delos Santos approached the car, he saw Weith "standing outside his car" at the "[d]river's side." Delos Santos, who knew Weith as a monthly parker, approached him and asked if he needed help. Weith, who was about 10 feet away, looked at Delos Santos, made eye contact, but did not respond. Instead, within five seconds, Weith reentered his car as Delos Santos approached "to see if he needed help." The Camaro backed up and destroyed the arm gate. The car backed into a billboard and then went forward smashing into the arm gate.

Delos Santos approached to assess the damage and the car backed up again hitting the billboard. Delos Santos testified: "He drove forward, toward me. [¶] . . . [¶] All I heard was the tires screech—screeching." Delos Santos tried to get out of the way but, because of the small space, "there's no way for me to kind of like run away or get out of the way." Pinned between the car's front tire and his office, Delos Santos was "screaming in pain." He cried for help, "yelling at the top of [his] lungs" for "someone [to] back up the car." Delos Santos heard "the sound of screeching tires," but the car did not move. Weith did not assist Delos Santos.

In closing, the prosecutor recapitulated the evidence in support of his argument that Weith used the car in a way that is capable of causing and likely to cause death or great bodily injury. He did not refer to the Camaro as "inherently deadly." Rather, the prosecutor's argument focused on how Weith used the Camaro as a deadly weapon. As to the section 245, subdivision (a)(1) charge, the prosecutor argued "the defendant did an act with a deadly

10

weapon. The defendant willfully acted. . . . Defendant was aware of facts that would lead a reasonable person to conclude that his act, by its very nature, would directly and probably result in the application of force, and that the defendant had the present ability to actually apply force."

Instead of focusing on the car, the prosecutor directed the jury to the manner in which Weith drove it: "[T]he act we're talking about is driving the car, and by [his] very nature of driving the car, he hits the booth, injures Victor Delos Santos. And the defendant testified, I asked him directly, you wanted to put the car in drive, . . . you wanted the car to go forward, you put your foot on the accelerator, the car went forward, you intended to do all of those actions."

The prosecutor later added: "[A] reasonable person would know that when you park in this place for four years, you drive in and out every single day, there are people all over the place, it's downtown San Francisco . . . and you've actually had contact with the person that works in that office. A reasonable person, in those circumstances, would absolutely know that . . . by putting your foot on the accelerator when your car's in drive, you are very likely to injure someone." The prosecutor argued that Weith "knew Mr. Delos Santos was there and actually intended to hit Mr. Delos Santos." The court did not define "inherently deadly" and the prosecutor—relying on the video and Delos Santos's testimony—argued that Weith purposely drove the car in a manner capable of causing death or great bodily injury.

With this evidence, and without further definition of inherently deadly, the jury could understand that the Camaro was "inherently deadly," "in the colloquial sense of the term—i.e., readily capable of inflicting deadly harm— and that defendant used it as a weapon." (*Aledamat*, *supra*, 8 Cal.5th at p. 15.) On this record "we can say, beyond a reasonable doubt, the jury's

11

actual verdicts were not tainted by the inaccurate jury instruction." (*People v. Thompkins*, *supra,* 50 Cal.App.5th at p. 399.)

Accordingly, any error in the court's instructions defining "deadly weapon" was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

## B.    *Omission of "Unlawful Attempt" and "Violent Injury" Language*

Weith claims the trial court erred in instructing the jury using CALCRIM No. 875 (assault with a deadly weapon) and CALCRIM No. 915 (simple assault) because the instructions "inexplicably" omit section 240's definition: "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." Both instructions have been expressly affirmed by our appellate courts. (See *People v. Golde* (2008) 163 Cal.App.4th 101, 122 [CALCRIM No. 875 "was not defective in failing to tell the jurors they could consider the absence of injury as reflecting an absence of intent to harm"]; *People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1193–1195 [upholding CALCRIM No. 915 as correct statement of law].)

In California, the law is settled that assault is a general intent crime. (*People v. Chance* (2008) 44 Cal.4th 1164, 1169 (*Chance*).) Unlike attempt crimes, which require specific intent, the " 'unlawful attempt' " term of section 240 is different. "Assault requires an act that is closer to the accomplishment of injury than is required for other attempts. Other criminal attempts, because they require proof of specific intent, may be more remotely connected to the attempted crime." (*Id*. at p. 1167.) Assault has been characterized as " 'unlawful conduct immediately antecedent to battery.' " (*Ibid.*)

Additionally, the "terms 'violence' and 'force' are synonymous when used in relation to assault, and include any application of force even though it

entails no pain or bodily harm and leaves no mark." (*People v. Flummerfelt* (1957) 153 Cal.App.2d 104, 106; see *People v. Rocha* (1971) 3 Cal.3d 893, 899, fn. 12 (*Rocha*); *People v. Colantuono* (1994) 7 Cal.4th 206, 214, fn. 4 (*Colantuono*).) It is settled that "the criminal intent which is required for assault with a deadly weapon . . . is the general intent to willfully [*sic*] commit an act the direct, natural and probable consequences of which if successfully completed would be the injury to another." (*Rocha,* at p. 899.) "[B]ut only an 'injury' as that term is used with respect to a battery need be intended. 'It has long been established, both in tort and criminal law, that "the least touching" may constitute battery.' " (*Rocha*, at p. 899, fn.12.)

Consistent with the forgoing case law, the trial court's instructions on assault with a deadly weapon (CALCRIM No. 875) and simple assault (CALCRIM No. 915) correctly informed the jury that the crimes involve an act that is naturally and likely to result in the "application of force" to a person and that the term "application of force" means "to touch in a harmful or offensive manner" and can include the "slightest touching." (CALCRIM Nos. 875, 915.) Accordingly, we reject Weith's assertions that CALCRIM No. 875 and CALCRIM No. 915, which have been expressly approved by appellate authority, omitted essential elements and lightened the prosecution's burden of proof on the assault charge.

## C.    *Omission of "Specific Intent" Language*

Again, in the face of established California Supreme Court precedent to the contrary, Weith claims that assault is a specific intent crime and the trial court erred in instructing the jury that it is a general intent crime. We will quickly dispense with this argument; our Supreme Court has held repeatedly that assault is a general intent crime. (*People v. Williams* (2001) 26 Cal.4th 779, 782 (*Williams*) [assault requires only a general criminal intent];

13

accord, *In re B.M.* (2018) 6 Cal.5th 528, 533 ["Assault is a general intent crime; it does not require a specific intent to cause injury."]; *People v. Perez* (2018) 4 Cal.5th 1055, 1066 ["assault with a deadly weapon is a general intent crime"]; *Chance, supra,* 44 Cal.4th at p. 1170 [" 'specific intent to injure is not an element of assault because the assaultive act, by its nature, subsumes such an intent' "].)

## II. Constitutional Claim

Weith contends his convictions for assault with a deadly weapon and battery causing serious bodily injury should be reversed because the assault statute (§ 240) is unconstitutionally vague because it fails to define assault with sufficient notice of the prohibited conduct. The Attorney General responds that Weith lacks standing to raise a vagueness challenge because his conduct is clearly encompassed by the assault statutes (§§ 240, 245). We do not address the standing issue because Weith's vagueness claim fails on the merits.

### A. *Applicable Law*

"Statutes are presumed valid and must be upheld unless their unconstitutionality is positively and unmistakably demonstrated. With regard to vagueness, the question is whether the statute provides a person of ordinary intelligence a reasonable opportunity to know what is prohibited and provides police and prosecutors with sufficiently definite guidelines to prevent arbitrary and discriminatory enforcement." (*People v. Basuta* (2001) 94 Cal.App.4th 370, 397.)

"It is impossible, given the complexities of our language and the variability of human conduct, to achieve perfect clarity in criminal statutes. Reasonable specificity exists if the statutory language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common

understandings and practices.' (*United States v. Petrillo* (1947) 332 U.S. 1, 8; see also *People v. Deskin* (1992) 10 Cal.App.4th 1397, 1400.) Given these practical difficulties, one commentary has stated: 'In practice, unconstitutional vagueness is a concept that only works on the extreme end of the vagueness continuum . . . . Arguments that a statute appears vague in the ordinary sense will not suffice to bring relief from the courts.' (2 Antieau & Rich, Modern Constitutional Law (2d ed. 1997) § 38.00, p. 429.)" (*People v. Basuta, supra,* 94 Cal.App.4th at p. 397.)

## B.   *Analysis*

Section 240 defines assault as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." The language of the assault statute is "derive[d] from identical language of section 49 of the Crimes and Punishment Act of 1850. (Stats. 1850, ch. 99, § 49, p. 234.)" (*People v. Wright* (2002) 100 Cal.App.4th 703, 714.) Although Weith engages in an extended analysis tracing the evolution of the assault law, discussing cases ranging as far back as 1856, the assault statute has remained unchanged since its inception. (See *Williams, supra,* 26 Cal.4th at p. 782.) Its long history "virtually precludes us from finding it impermissibly vague at this late date." (*People v. Kelly* (1992) 1 Cal.4th 495, 534; *People v. Bamba* (1997) 58 Cal.App.4th 1113, 1122.)

That the assault law has required continued clarification does not make it unconstitutionally vague. "Many, probably most, statutes are ambiguous in some respects and instances invariably arise under which the application of statutory language may be unclear." (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1201.) It is the traditional role of the judiciary to interpret ambiguous language and fill in the gaps. (*Id.* at p. 1202.) Assault has been consistently construed as a general intent crime requiring a willful

act which by its nature would probably and directly result in the application of physical force to another (see, e.g., *Rocha, supra,* 3 Cal.3d at pp. 898–899; *Colantuono*, *supra*, 7 Cal.4th at pp. 214–216) committed with the actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of force to another—i.e. a battery (see, e.g., *Williams*, *supra*, 26 Cal.4th at pp. 782, 790). Additionally, "when a defendant equips and positions himself to carry out a battery, he has the 'present ability' required . . . if he is capable of inflicting injury on the given occasion, even if some steps remain to be taken, and even if the victim or the surrounding circumstances thwart the infliction of injury." (*Chance, supra,* 44 Cal.4th at p. 1172.)

This consistent interpretation of the assault law provides sufficient notice of the prohibited conduct. Accordingly, Weith's vagueness challenge fails.

### III.   Diversion of Individuals with Mental Disorders

### A.   *The parties' positions*

Weith argues the court abused its discretion in denying his request for a pretrial mental health diversion hearing pursuant to section 1001.36. The Attorney General replies that Weith forfeited this claim by only briefly raising the issue at the time of sentencing, and that on the merits we should affirm, and not remand for sentencing, because the trial court found Weith unsuitable for mental health diversion.

Preliminarily, we reject the Attorney General's argument that Weith "forfeited" his request for diversion under section 1001.36. The record clearly reflects that Weith raised the issue, albeit succinctly, in the trial court. Nevertheless, as we explain, Weith's request was untimely.

## B. Section 1001.36

Diversion of Individuals with Mental Disorders (§ 1001.35 et seq.), effective a little over two months before Weith's trial, "authorizes a pretrial diversion program for defendants with qualifying mental disorders." (*Frahs, supra,* 9 Cal.5th at p. 626.) The stated purpose of the diversion statute "is to promote all of the following: [¶] (a) Increased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety. [¶] (b) Allowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings. [¶] (c) Providing diversion that meets the unique mental health treatment and support needs of individuals with mental disorders." (§ 1001.35, subds. (a)-(c).)

Section 1001.36 defines "pretrial diversion" to "mean[] the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged *until adjudication,* to allow the defendant to undergo mental health treatment . . . ." (§ 1001.36, subd. (c), italics added.)

The statute does not define the phrase "until adjudication." At the time of the November 2, 2018 sentencing hearing, there was no appellate guidance regarding the meaning of "until adjudication." Since then case law has offered three different dates by which pretrial diversion must be requested: before trial commences; before conviction, be it by guilty plea or verdict; or before sentencing. The first and most lenient court to address the issue held "adjudication" does not occur until sentencing and entry of judgment. (*People v. Curry* (2021) 62 Cal.App.5th 314, 321, review granted July 14, 2021, S267394 (*Curry*) ["section 1001.36 contemplates mental health diversion

17

until entry of the judgment of conviction"].) At the other end of the spectrum, the Fourth Appellate District found the right to seek mental health diversion is lost when the jury is sworn. (*People v. Braden* (2021) 63 Cal.App.5th 330, 333, review granted July 14, 2021, S268925 (*Braden*) ["a defendant is ineligible for diversion under section 1001.36 after his trial begins"].) Between these extremes—and the outcome we adopt—"adjudication" occurs when guilt is established either by plea or jury verdict. (*People v. Rodriguez* (2021) 68 Cal.App.5th 584, 591, review granted Nov. 10, 2021, S270895 (*Rodriguez*) [request for pretrial diversion under section 1001.36 "untimely . . . if presented after the defendant's conviction by guilty plea"]; *People v. Graham* (2021) 64 Cal.App.5th 827, 832–833, review granted Sept. 1, 2021, S269509 (*Graham*) ["a request for 'pretrial diversion' under section 1001.36 is timely only if it is made prior to the jury's guilty verdict"].)

C.    ***Standard of Review and Rules of Statutory Interpretation***

Weith's claim presents an issue of statutory interpretation, which we review de novo. (*People v. Simmons* (2012) 210 Cal.App.4th 778, 790.)

" ' "Our role in construing a statute is to ascertain the Legislature's intent so as to effectuate the purpose of the law. [Citation.]" ' [Citations.] [¶] Our first task is to examine the language of the statute . . ., giving the words their usual, ordinary meaning. [Citations.] If the language is clear and unambiguous, we follow the plain meaning of the measure. [Citations.] . . . [¶] The language is construed in the context of the statute as a whole and the overall statutory scheme, and we give 'significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose.' " (*People v. Canty* (2004) 32 Cal.4th 1266, 1276 (*Canty*).)

Where the language of the statute permits more than one reasonable interpretation, we "apply the principles that pertain where statutory

18

ambiguity exists, adopting the interpretation that leads to a more reasonable result. [Citation.] It is appropriate to consider evidence of the intent of the enacting body in addition to the words of the measure, and to examine the history and background of the provision, in an attempt to ascertain the most reasonable interpretation." (*Canty, supra,* 32 Cal.4th at p. 1277.)

"We also consider that, under the traditional 'rule of lenity,' language in a penal statute that truly is susceptible of more than one reasonable construction in meaning or application ordinarily is construed in the manner that is more favorable to the defendant. [Citation.] Nonetheless, ' "the rule of lenity applies only if the court can do no more than guess what the legislative body intended; there must be an egregious ambiguity and uncertainty to justify invoking the rule." ' " (*Canty, supra,* 32 Cal.4th at p. 1277.) " ' "The rule of statutory interpretation that ambiguous penal statutes are construed in favor of defendants is inapplicable unless two reasonable interpretations of the same provision stand in relative equipoise, i.e., that resolution of the statute's ambiguities in a convincing manner is impracticable." [¶] Thus, although true ambiguities are resolved in a defendant's favor, an appellate court should not strain to interpret a penal statute in defendant's favor if it can fairly discern a contrary legislative intent.' " (*Canty,* at pp. 1276–1277.)

## D.    *Analysis*

We agree with *Graham,* that the statute's "plain language" and the "purpose" of mental health diversion compel the conclusion that "a request for 'pretrial diversion' under section 1001.36 is timely only if it is made prior to the jury's guilty verdict." (*Graham, supra,* 64 Cal.App.5th at p. 833.) "Section 1001.36 explicitly defines 'pretrial diversion' as the 'the postponement of prosecution . . .at any point in the judicial process from the point at which the

19

accused is charged *until adjudication.'* (§ 1001.36, subd. (c), italics added.)" (*Graham,* at p. 833.)

"The definition says that diversion must occur before 'adjudication,' and 'adjudication' typically refers to an adjudication of guilt—whether by plea or by jury verdict.' [Citations.] The plain text of section 1001.36 is controlling.

"The tripartite purposes of section 1001.36 are to (1) '[i]ncrease[] diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety,' (2) '[a]llow[] local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings,' and (3) '[p]rovid[e] diversion that meets the unique mental health treatment and support needs of individuals with mental disorders.' (§ 1001.35.) These purposes are fully served by allowing a defendant to seek mental health pretrial diversion prior to adjudication of their guilt." (*Graham*, *supra*, 64 Cal.App.5th at p. 833.)[4]

*Graham* further observed that permitting a defendant to seek pretrial diversion through entry of judgment would invite "the inefficient use of finite judicial resources" and would potentially turn trial into a " 'read through' " that could be rendered "retroactively moot should pretrial diversion be

---

[4] Courts considering the legislative intent for other pretrial diversion programs (e.g., § 1000 et seq.) have consistently reached the same conclusion: To achieve the legislative purposes, pretrial diversion must necessarily be requested before conviction. (See *People v. Reed* (1975) 46 Cal.App.3d 625, 629-630 [court's order for section 1000 drug diversion after trial reversed]; *People v. Wright* (1975) 47 Cal.App.3d 490, 494 [defendant ineligible for section 1000 diversion after trial]; *People v. Alonzo* (1989) 210 Cal.App.3d 466, 468, 470 [trial court acted in excess of its jurisdiction by granting section 1000 drug diversion after trial].)

requested following a guilty verdict." (*Graham, supra,* 64 Cal.App.5th at p. 834.)[5]

*Rodriguez* agreed with *Graham* to conclude that adjudication by guilty plea, like guilty verdict, precludes mental health diversion. (*Rodriguez, supra,* 68 Cal.App.5th at p. 591.) Finding " ' "no distinction between an adjudication of guilt based on a plea of guilt and that predicated on a trial on the merits," ' " *Rodriguez* concluded that a request for mental health diversion is untimely under section 1001.36, subdivision (c), if presented after the defendant's conviction by guilty plea. (*Ibid.*)

Weith urges us to rely on *Curry, supra,* 62 Cal.App.5th 314, which held that "a defendant may ask the trial court for mental health diversion until sentencing and entry of judgment." (*Id.* at p. 325.)[6] Absent clear direction from the Supreme Court, the *Curry* court relied primarily on language in *Frahs, supra,* 9 Cal.5th 618. (*Curry*, at pp. 322–325.) However, *Frahs* expressly refrained from defining "until adjudication," and differentiated the retroactive availability of mental health diversion under *In re Estrada* (1965)

_____

[5] *Braden* reviewed the history of California's diversion programs "found in sections 1000 through 1001.97" and observed: "We are not aware of any cases indicating that, in the normal course, a defendant can be (or has been) admitted to any such [diversion] programs after conviction at trial. Rather, the purpose of diversion and deferred entry of judgment programs "is precisely to *avoid* the necessity of a trial. [Citations.] (*People v. Alonzo*[, *supra,*] 210 Cal.App.3d 468, 470 [trial court acted in excess of its jurisdiction by granting diversion after trial.] Our view of section 1001.36 fits comfortably into the norm for our Legislature's diversion programs." (*Braden*, *supra,* 63 Cal.App.5th at p. 335; see *Gresher v. Anderson* (2005) 127 Cal.App.4th 88, 111 ["The purpose of those programs is precisely to *avoid* the necessity of a trial"].)

[6] In *Curry*, unlike in our case, "[t]he People [did] not take a position on the timeliness of defendant's [mental health diversion] request. (*Curry, supra,* 62 Cal.App.5th at p. 320.)

21

63 Cal.2d 740 from "how the statute will generally operate when a case comes before the trial court after section 1001.36's enactment." (*Frahs, supra,* 9 Cal.5th at pp. 632, 633, fn. 3.) Although acknowledging the dicta in *Frahs* was equivocal, the *Curry* court nevertheless concluded the "balance of dicta" favored its conclusion. (*Curry*, at pp. 323–324.) The court also reasoned that the "overall statutory scheme" of section 1001.36, which it viewed as investing trial courts with "broad discretion" in deciding when and whether to grant diversion, supported an expansive interpretation of section 1001.36. (*Curry*, at pp. 324–325.)

We disagree and join *Rodriguez* and *Graham* in concluding that the broad statutory scheme observed in *Curry* was not, of itself, sufficient to " 'countermand . . . the otherwise clear intent of the Legislature to require pretrial diversion to be sought before a verdict.' " (*Rodriguez, supra,* 68 Cal.App.5th at p. 592; *Graham*, *supra,* 64 Cal.App.5th at p. 835.) While acknowledging the Supreme Court's explicit statement—" '[W]e have no occasion here to precisely define "until adjudication," as used in section 1001.36, subdivision (c) (*Frahs, supra,* 9 Cal.5th at p. 633, fn. 3)"— the *Curry* court sought to divine meaning from that which the Supreme Court expressly declined to decide. (*Curry*, *supra,* 62 Cal.App.5th at pp. 323–324.) Unlike *Rodriguez* and *Graham,* which interpreted "adjudication" in its context in the statute, *Curry* recognizes "there is some language in *Frahs* that reasonably might be cited in support of the argument that the phrase 'until adjudication' in section 1001.36 should be interpreted to mean 'until adjudication of *guilt,*' " but nevertheless concludes, based on "the weight of considered reasoning in the case" that "the phrase 'until adjudication' should be interpreted to mean 'until the judgment of conviction'—which does not occur until sentencing." (*Curry*, at p. 323.) We considered the "usual, ordinary meaning" of

"adjudication" in "the context in which the word[] appear[s]" in the statute and find no support for *Curry's* conclusion. (See *Curry,* at pp. 321–323.) *Rodriguez, Graham,* and *Braden* reject *Curry*'s conjecture about phrases in *Frahs*, and so do we. (See *Rodriguez, supra,* 68 Cal.App.5th at p. 591; *Graham, supra*, 64 Cal.App.5th at p. 834; *Braden, supra*, 63 Cal.App.5th at p. 341.)

We find further support for the *Rodriguez* and *Graham* holdings by considering pretrial mental health diversion (§ 1001.35, et seq.) in the context of the panoply of pretrial diversion schemes. The Legislature enacted five diversion programs that employ the same time frame for pretrial eligibility: from "any point in the judicial process from the point at which the accused is charged *until adjudication.*" (§ 1001.36, subd. (c), italics added ["diversion of individuals with mental disorders"]; § 1001.1 ["misdemeanor diversion"]; § 1001.50, subd. (c) ["diversion of misdemeanor offenders"]; § 1001.70, subd. (b) ["parental diversion"]; § 1001.80, subd. (k)(1) ["military diversion program"]. Unlike these regimes, a sixth pretrial program, diversion of defendants with cognitive developmental disabilities (§ 1001.20 et seq.), does not limit its availability "until adjudication." Section 1001.21, subdivision (a) applies "whenever a case is before any court upon an accusatory pleading *at any stage of the criminal proceedings*" (italics added.) Had the Legislature intended for pretrial mental health diversion to similarly apply regardless of the procedural posture of the case, it would presumably have said so as it did in section 1001.21. (See, e.g., *California Ins. Guarantee Assn. v. Argonaut Ins. Co.* (1991) 227 Cal.App.3d 624, 633–634 ["Insurance Code section 1063.1 shows that the Legislature knew how to make an exception for workers' compensation benefits when it so intended"].) It did not.

Even were we to conclude that "until adjudication" is "susceptible of more than one reasonable . . . meaning," we do not have to " ' "guess what the legislative body intended" ' " and therefore do not apply the rule of lenity. (*Canty, supra,* 32 Cal.4th at p. 1277.) To "construe[] [the words] in the manner that is more favorable to [Weith]" would require us to "strain to interpret a penal statute in defendant's favor" where we " 'can fairly discern a contrary legislative intent.' " (*Canty,* at pp. 1276–1277.) For the reasons stated in *Graham* and *Rodriguez* and above, we conclude that "until adjudication" means until conviction: ascertainment of guilt, whether by a jury (as in *Graham*) or by a guilty plea (as in *Rodriguez*).[7]

Because Weith's postconviction diversion request was untimely, we do not reach the merits of his claim.

## DISPOSITION

The judgment is affirmed.

---

[7] At oral argument, Weith contended for the first time that, because the attempted murder charge precluded pretrial mental health diversion, he should have been allowed to request it after acquittal on that charge. The contention is forfeited by Weith's failure to raise it in his opening brief. (*Doe v. California Dept. of Justice* (2009) 173 Cal.App.4th 1095, 1115.)

                                         _____

                                         Ross, J.[*]

WE CONCUR:


_____

Pollak, P.J.


_____

Brown, J.

*A155950  People v. Weith*

---

[*] Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

25