Filed 3/1/24  P. v. Watts CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CAMREN WATTS,<br><br>    Defendant and Appellant. | A166114<br><br>(Alameda County<br>Super. Ct. No. 20CR011859C) |

Armed with pistols and an assault rifle, Camren Watts and two other men surrounded a parked car, with two sleeping men inside.  The three men opened fire, shooting into the car at close range, and severely injuring the occupants.  Watts shot into the car five times.  A jury convicted him of several felonies, including attempted murder and shooting at an occupied motor vehicle.  The trial court sentenced him to a lengthy prison term.

Watts raises six claims on appeal.  We stay the punishment for shooting at an occupied vehicle pursuant to Penal Code section 654.  (Undesignated statutory references are to this code.)  We otherwise affirm.[1]

_____

[1] After this appeal was fully briefed, Watts filed a habeas petition alleging the prosecutor failed to disclose material and exculpatory evidence. (Case No. A169453.)  By separate order filed today's date, we issue an order to show cause returnable to the superior court.  The facts as recounted in this opinion are based solely on the evidence at trial, viewed in the light most favorable to the prosecution.

# BACKGROUND

On a morning in September 2020, Harlon McElevaine and Bernard VanBuren were at a house on 63rd Avenue.[2]  Thereafter, Watts — who was wearing red shoes — and a woman arrived in a silver Nissan.  The four people congregated around McElevaine's Mercedes SUV for approximately two hours.  During that time, Watts pointed a tan handgun at the sky.

At approximately 11:00 a.m., the group left the house in a Mercedes driven by McElevaine.  An Instagram live video recorded at 11:00 a.m. — and posted on McElevaine's account — shows him driving the Mercedes.  VanBuren is in the passenger seat, and Watts is in the seat behind the driver.  VanBuren is holding an assault-style rifle, and Watts points a tan pistol with a drum magazine at the phone.  The woman, sitting next to Watts, points a black pistol with an extended magazine at the phone.

At approximately 1:00 p.m., the Mercedes picked up David Keller.  The Mercedes drove to the corner of West and 51st Streets and parked.  Watts — still wearing red shoes — McElevaine, and Keller stood outside the Mercedes.  The men approached and surrounded a compact car parked across 51st Street, in which B.Q. and T.F. were sleeping.

Watts had a dark object in his hand, McElevaine held his waistband, and Keller carried a rifle.  Watts pointed the dark object at the car with his arm extended and shot at the car; so did McElevaine and Keller.  B.Q. and T.F. awoke to gunfire.  B.Q. suffered three gunshot wounds and, believing he

---

[2] We provide an overview of the facts here and additional detail in the discussion of Watts's claims.  Numerous police officers surveilled McElevaine on the day of the shooting and, while doing so, personally observed the events leading up to, and including, the shooting.  This summary is derived from their testimony.

would die if he stayed in the car, fled along with T.F. Watts, McElevaine, and Keller peered inside the car, ran back to the Mercedes, and drove away.[3]

After the shooting, the Mercedes dropped off Keller at a nearby mall, where police officers arrested him. The Mercedes then drove to a residence on 57th Avenue. VanBuren got out of the car, walked down the driveway, and disappeared behind a duplex. Thereafter, an older man left the duplex with a duffel bag and drove away in a red Acura. A police officer stopped the Acura immediately, searched the vehicle, and found an assault-style rifle, a black pistol with an extended 30-round magazine, and a tan pistol with a 50-round drum magazine.

The Mercedes continued on its journey. It drove a few blocks away, to 63rd Avenue, where another person got out of the car. Shortly thereafter, police officers saw Watts on the same street in a silver sedan. Less than ten minutes later, officers arrested Watts on 89th Avenue shortly after a silver sedan parked there.

An evidence technician found 10 shell casings around B.Q. and T.F.'s car. A criminologist concluded five casings were fired from the tan pistol. The remaining casings were fired from the assault-style rifle and the black pistol.

The jury convicted Watts of the attempted murder of B.Q. (§§ 187, 664; count 2); assaulting B.Q. and T.F. with a semiautomatic firearm (§ 245, subd. (b); counts 4 & 5); shooting at an occupied vehicle (§ 246; count 6); unlawful firearm activity (§ 29820, subd. (b); count 7); and carrying a loaded

---

[3] Neighbors heard gunshots. One neighbor saw a group of men — one of whom was carrying an assault rifle — walking down the street. Another neighbor heard numerous gunshots, and saw a man with a rifle and another with a pistol. The neighbor saw the man with the pistol fire two shots as he fled.

firearm in public (§ 25850, subd. (a); count 8).  It also found true various aggravating circumstances and sentencing enhancements, including that he used a firearm in the commission of count 2.  (§ 12022.53, subd. (b).)  Watts admitted he had a prior strike conviction.  (§ 1170.12.)  The trial court sentenced him to 22 years, 8 months in prison.

## DISCUSSION

Watts advances six theories of error on appeal.  We address each argument in turn.[4]

## I.

Watts contends his convictions must be reversed because the trial court prejudicially erred by excluding him from the "initial meeting" between the court, counsel, and prospective jurors in the jury selection room on June 9, 2022.

To place the issue in context, we provide additional background: On June 9, 2022, the trial court met with prospective jurors in its jury selection room — rather than its courtroom — due to social distancing requirements because of the COVID-19 pandemic.  Before the meeting, and outside the presence of any jurors, the court noted it would not allow Watts to be present at the meeting because the room had numerous exits and could not be secured.  Watts objected to "not being present during that initial meeting with the jury."

The trial court overruled the objection.  It explained that under the county's COVID regulations, the courtroom could only hold 37 potential jurors rather than the 82 it did before the pandemic.  As the court explained,

---

[4] We address Watts's arguments on the merits to obviate the need to adjudicate Watts's ineffective assistance of counsel claims.  (*People v. Williams* (1998) 61 Cal.App.4th 649, 657.)

it would take three days to fill out hardship questionnaires in the courtroom, and doing so was impractical. Relying on *Elias v. Superior Court* (2022) 78 Cal.App.5th 926, the court concluded it could exercise its judgment to control its calendar with economy. The court explained to Watts that, in his absence, it would only take roll, hand out questionnaires, and get hardship forms back; the court assured Watts that he'd be present for jury selection — where 18 prospective jurors would be questioned at a time.

In Watts's absence, the clerk swore in prospective jurors on voir dire, the judge and counsel introduced themselves, and potential jurors were given hardship questionnaires. The trial court ruled on the completed questionnaires and instructed the jury to return on June 15, 2022, for voir dire and jury selection. Watts was present for voir dire, jury selection, and the swearing in of the jury.

A criminal defendant's right to be personally present at trial is guaranteed under the federal and state Constitutions and by statute. (*People v. Concepcion* (2008) 45 Cal.4th 77, 81.) "Under the Sixth Amendment, a defendant has the right to be personally present at any proceeding in which his appearance is necessary to prevent 'interference with [his] opportunity for effective cross-examination.'" (*People v. Butler* (2009) 46 Cal.4th 847, 861.) "Due process guarantees the right to be present at any 'stage . . . that is critical to [the] outcome' and where the defendant's 'presence would contribute to the fairness of the procedure.'" (*Ibid.*) The state constitutional right "'is generally coextensive with the federal due process right.'" (*Ibid.*) Sections 977 and 1043 require, among other things, that defendants charged with felonies be present for trial and "all other proceedings," unless the defendant waives their presence or they are removed for disruptive behavior. (*People v. Cunningham* (2015) 61 Cal.4th 609, 634–635.)

" 'Neither the state nor the federal Constitution, nor the statutory requirements of sections 977 and 1043, require the defendant's personal appearance at proceedings where his presence bears no reasonable, substantial relation to his opportunity to defend the charges against him.' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 799.)  The " '[d]efendant has the burden of demonstrating that his absence prejudiced his case or denied him a fair trial.' "  (*Ibid.*)  We review a trial court's exclusion of a criminal defendant from trial, in whole or in part, de novo.  (*People v. Waidla* (2000) 22 Cal.4th 690, 741.)

The trial court did not violate Watts's right to be present at trial by excluding him from the June 9, 2022 "initial meeting," where the court distributed — and ruled on — hardship questionnaires.  Our high court has held hardship screening of the jury pool, even when conducted by the trial judge, is not a crucial stage of the proceedings and, as a result, a defendant has no absolute right to be present.  (*People v. Ervin* (2000) 22 Cal.4th 48, 72–74; *People v. Streeter* (2012) 54 Cal.4th 205, 233 ["[h]ardship screening of the jury pool is not a critical stage of the proceedings"]; *People v. Basuta* (2001) 94 Cal.App.4th 370, 395.)  Watts does not dispute this premise or distinguish these cases.

Relying on *Gomez v. United States* (1989) 490 U.S. 858, 873 and *People v. Granderson* (1998) 67 Cal.App.4th 703, 707–708, Watts argues jury selection and voir dire are critical stages of trial.  This is true as far as it goes, but Watts was present for both.  He only missed hardship screening.  Put simply, he has not shown anything occurring on June 9 was critical to the proceeding.

Even if we assume the trial court erred in excluding Watts on June 9, Watts has not established his absence affected his ability to defend himself or

6

otherwise prejudiced his case.  (*People v. Blacksher*, *supra*, 52 Cal.4th at p. 800.)  He was present for jury selection, voir dire, and the swearing in of the jury, where he had the opportunity to observe and consider the demeanor of prospective jurors.  (*People v. Wall* (2017) 3 Cal.5th 1048, 1057, 1061 [defendant who missed voir dire of six potential jurors, the exercise of peremptory challenges, and the swearing in of the jury suffered no prejudice because it was not reasonably probable "a different jury would have been chosen or that the jury . . . would have reached a different verdict"].)  This case bears no resemblance to *Larson v. Tansy* (10th Cir. 1990) 911 F.2d 392, where the defendant's absence from jury instructions, closing arguments, and the rendition of the verdict was prejudicial.  (*Id.* at pp. 395–396.)

Moreover, any assumed error was not structural.  The cases Watts cites are inapposite.  *Larson v. Tansy*, *supra*, 911 F.2d 392 and *People v. Wall*, *supra*, 3 Cal.5th 1048 evaluated the defendant's absence from trial for a reasonable probability of a different result — the former for a constitutional error, and the latter for a statutory error.

Nor are we persuaded by Watts's suggestion that he suffered prejudice because his absence could have led to the inference he was a security risk, or that the trial court should have taken "lesser alternatives" to prevent an escape attempt such as shackling his ankles in ways that weren't visible to potential jurors or "severing . . . voir dire" into multiple panels.  (Italics omitted.)  These arguments are forfeited and lack record support.  (See *People v. Saunders* (1993) 5 Cal.4th 580, 589–590.)  Contrary to his assertions, Watts was present for voir dire.

In sum, Watts has not shown he missed a critical stage of the proceedings nor has he established his absence affected his ability to defend himself.

## II.

Watts challenges his conviction for the attempted murder of B.Q. on several grounds. First, he contends there was insufficient evidence that he intended to kill B.Q. when he shot into the car. Not so.

Attempted murder requires "a specific intent to kill" and a "direct but ineffectual act toward accomplishing the intended killing." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 605.) " 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Avila* (2009) 46 Cal.4th 680, 701.) We presume " 'in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*Ibid.*) " 'This standard applies whether direct or circumstantial evidence is involved.' " (*Ibid.*) Intent to kill " 'may . . . be inferred from the defendant's acts and the circumstances of the crime.' " (*Ibid.*)

Sufficient evidence supports the jury's finding that Watts intended to kill B.Q. Police officers saw Watts and his confederates fire eight bullets from close range into a compact car containing two occupants. Watts fired five times, and B.Q. suffered three gunshot wounds. On this record, the jury could reasonably conclude he intended to kill B.Q. (*People v. Smith* (2005) 37 Cal.4th 733, 736–737 [sufficient evidence supported conviction for attempted murder where the defendant fired a single bullet through rear windshield from a few feet behind the car].)

Second, Watts argues the jury was required to acquit because it faced two conflicting inferences as to whether he intended to kill while shooting

8

into the car. The argument misapprehends the standard of review. We cannot substitute our judgment for that of the jury. (*People v. Cravens* (2012) 53 Cal.4th 500, 507–508.) If the circumstances justify the jury's findings, we cannot reverse merely because the circumstances " ' " " 'might also reasonably be reconciled with a contrary finding." ' " ' " (*Id.* at p. 508.) As discussed above, ample evidence supported the jury's conclusion that Watts intended to kill B.Q.

Third, Watts argues the prosecutor relied on a kill zone theory as a basis for proving his intent to kill, and insufficient evidence supported that theory. Watts misunderstands the theory.

A kill zone theory allows "a concurrent intent to kill as a permissible theory for establishing the specific intent requirement of attempted murder." (*People v. Canizales* (2019) 7 Cal.5th 591, 602, italics omitted.) Generally, without a kill zone theory, when "a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim." (*Ibid.*) In other words, "an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine." (*Ibid.*) Under the kill zone theory, however, "the nature and scope of the attack directed at a primary victim may raise an inference that the defendant ' "intended to ensure harm to the primary victim by harming everyone in that victim's vicinity." ' " (*Ibid.*) The kill zone theory is "an additional, alternative ground by which to prove the requisite intent to kill." (*Id.* at p. 603.) It does not preclude the conclusion that a defendant intended to kill two people simply because they fired one bullet at the two people. (*People v. Smith, supra,* 37 Cal.4th at pp. 736–737, 745–746 [rejecting kill zone theory, and finding

9

sufficient evidence to support two attempted murder convictions, where defendant fired one bullet into car with two people].)

There is nothing in the record indicating the prosecutor relied on a kill zone theory. The prosecutor did not argue Watts had a "primary victim" and that he intended harm to everyone in that victim's vicinity. (*People v. Canizales*, *supra*, 7 Cal.5th at p. 602.) Instead, the prosecutor argued Watts intended to kill B.Q. *and* T.F. For example, the prosecutor began closing arguments by stating, "Watts tried to murder two people." And he emphasized Watts "tried to kill" B.Q. and T.F. when he pulled the trigger; he "tried to murder those two human beings." When reviewed in its entirety, the record clearly demonstrates the prosecutor did not argue the kill zone theory. (See *People v. Avila*, *supra*, 46 Cal.4th at p. 701; *People v. Stone* (2009) 46 Cal.4th 131, 134–141 [finding evidence sufficient that defendant intended to kill without the assistance of a kill zone theory — and that kill zone theory instruction was inappropriate — when defendant fired a single shot at a group of rival gang members at a distance of four to five feet].)

We also find unpersuasive Watts's contention that the trial court had a sua sponte duty to instruct on the kill zone theory. Although a trial court "must instruct on general principles of law that are commonly or closely and openly connected to the facts . . . and that are necessary for the jury's understanding of the case," the court is "under no obligation to sift through the evidence to identify an issue that conceivably could have been, but was not, raised by the parties, and to instruct the jury, sua sponte, on that issue." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047, 1050.) The parties did not raise the kill zone theory, and the court had no duty to instruct on it. (*Ibid.*)

10

## III.

Watts argues the trial court erred by failing to give 2023 jury instructions at his 2022 trial. We disagree.

For background, in addition to the charges, the prosecutor also alleged aggravating circumstances. They included: Watts's crimes involved great violence, great bodily harm, the threat of great bodily harm, or other acts disclosing a high degree of cruelty; he was armed with or used a weapon; and he engaged in violent conduct that indicated a serious danger to society. (Cal. Rules of Court, rules 4.421(a)(1), (a)(2) & (b)(1).) The trial court gave CALCRIM No. 3250, the 2022 pattern jury instruction on the prosecution's burden to prove aggravating circumstances.

Watts argues the trial court should have given CALCRIM Nos. 3224, 3225, and 3226 — the 2023 pattern jury instructions defining aggravating circumstances. The revised instructions now require the jury to find the aggravating circumstances are distinctly worse than an ordinary commission of the underlying crime. (CALCRIM Nos. 3224, 3225, & 3226 (2023 new).)

Jury instructions are not the law and "are not authority to establish legal propositions or precedent." (*People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7.) Moreover, the fact that jury instructions have been amended with additional clarifying language to better assist jurors does not make previous versions of the instruction incorrect. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 902.) Watts provides no authority — and our research has disclosed none — requiring a trial court to give jury instructions created after the conclusion of his trial. He also cites *People v. Black* (2007) 41 Cal.4th 799, 817, but *Black* merely defines aggravating circumstances. (*Ibid.*) *Black* does not require the court to instruct on that definition. (*Ibid.*)

11

## IV.

Watts argues we must remand for resentencing because the trial court erred in imposing a 10-year sentencing enhancement — for his personal use of a firearm — on the attempted murder of B.Q. (§ 12022.53, subd. (b).)

Before addressing the argument, we set forth the following additional background: The jury found the following sentencing enhancements: in the commission of count 2, Watts used a firearm while attempting murder, and he personally and intentionally discharged a firearm causing great bodily injury while attempting murder. (§ 12022.53, subds. (b) & (d).) On count 4 — the assault of T.F. — the jury found he personally used a firearm. (§ 12022.5, subd. (a).)

On count 2 — the attempted murder of B.Q. — the trial court imposed the upper term plus a 10-year enhancement for personally using a firearm. The court dismissed the other enhancements — including the longer 25-year-to-life enhancement on count 2 for causing great bodily injury — "based upon [its] analysis of 1385(c)," specifically citing Watts's "significant childhood trauma" and that imposition would "result in a sentence of more than 20 years." During sentencing, the court stated there were "overwhelming factors in aggravation." It called his crimes "senseless," reflecting "an attitude of just not caring about who you hurt." The court believed his "cold behavior . . . show[ed] a complete lack of caring," considered him "lucky that [B.Q.] didn't die" and imposed a "lengthy prison sentence" so he could "come out . . . not living this life any more."

Section 1385 requires a court to "dismiss an enhancement if it is in the furtherance of justice to do so." (*Id.*, subd. (c)(1); *People v. Coleman* (2024) 98 Cal.App.5th 709, 723–724.) In "exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence

12

offered by the defendant to prove" the presence of a statutorily enumerated mitigating circumstance. (§ 1385, subd. (c)(2); *Coleman*, at p. 724.) As relevant here, these mitigating circumstances include "application of an enhancement could result in a sentence of over 20 years," "[m]ultiple enhancements are alleged in a single case," the "current offense is connected to prior victimization or childhood trauma," and the "defendant was a juvenile when they committed" a "prior offense[]." (§ 1385, subd. (c)(2).) "Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." (*Ibid.*; *Coleman*, at p. 724.) " 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." (§ 1385, subd. (c)(2); *People v. Lipscomb* (2022) 87 Cal.App.5th 9, 16.)

We review a trial court's decision to not dismiss an enhancement for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 376–377.) A "trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Ibid.*) "The court is presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary." (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.)

The trial court's decision to impose the 10-year enhancement was not irrational or arbitrary. The record amply supports an implied conclusion that Watts was a danger to public safety. (See *People v. Myers, supra,* 69 Cal.App.4th at p. 310].) As stated above, the court found "overwhelming factors in aggravation," described Watts's crimes as "senseless," "cold," and reflecting "an attitude of just not caring about who you hurt." Moreover — and contrary to Watts's claim — the court did "afford great weight" to the

13

mitigating circumstances.  Indeed, the court *dismissed* two of three enhancements explicitly because of the mitigating circumstances and its analysis of section 1385.  We find no abuse of discretion in the court's decision to impose the 10-year enhancement.  (*People v. Ponder* (2023) 96 Cal.App.5th 1042, 1052–1053, review granted on different grounds Jan. 10, 2024, S282925.)

## V.

Watts asks us to stay the sentence on count 6 — shooting at an occupied vehicle.  Watts argues — and we agree — the trial court impermissibly punished his act of shooting at the car twice under two separate provisions — shooting at an occupied vehicle (§ 246; count 6) and attempted murder (§§ 187, 664; count 2).

Section 654 bars multiple punishments on convictions arising out of an indivisible course of conduct that are committed pursuant to a single criminal intent and objective.  (*People v. Corpening* (2016) 2 Cal.5th 307, 311.)  But if the "defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, [they] may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)  Whether section 654 applies " 'is a question of fact for the trial court, which is vested with broad latitude in making its determination.' " (*People v. Vang* (2010) 184 Cal.App.4th 912, 915–916.)  When a " 'court sentences a defendant to separate terms without making an express finding the defendant entertained separate objectives, [it] is deemed to have made an implied finding each offense had a separate objective.' " (*In re L.J.* (2021) 72 Cal.App.5th 37, 43.)  We review the court's " 'determination in the light

14

most favorable to the respondent and presume the existence of every fact the . . . court could reasonably deduce from the evidence.' " (*Vang*, at p. 916.)

Here, the trial court impermissibly imposed multiple punishments on convictions arising out of an indivisible course of conduct. (*People v. Trotter* (1992) 7 Cal.App.4th 363, 367–368.) That Watts shot five times in rapid succession, without other evidence, cannot sustain an implied finding of different objectives. (*Trotter*, at p. 368 [different objectives inferred from different shots when separated by enough time for defendant to reflect and consider his next action].) Indeed, the prosecutor argued imposing sentence on count 2 and 6 violated section 654. We stay the sentence of one year, eight months for shooting at an occupied vehicle.

## DISPOSITION

The trial court is ordered to amend the abstract of judgment to stay the sentence on count 6 pursuant to section 654, and to correct the spelling of Watts's name from "Carmen" to "Camren." The court shall forward the amended abstract of judgment to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

_____
RODRÍGUEZ, J.

WE CONCUR:


_____
TUCHER, P. J.


_____
PETROU, J.

A166114